BOSTON, CAPE COD & NEW YORK CANAL CO. v. T. A. SCOTT CO., Inc.
SAME v. WHITE OAK TRANSP. CO. WHITE OAK TRANSP. CO.
v. BOSTON, CAPE COD & NEW YORK CANAL CO.

(District Court, D. Massachusetts. April 10, 1918.)

Nos. 1517, 1518, 1555.

1. EVIDENCE ⬿66—PRESUMPTIONS—NAVIGATION—CAPE COD CANAL.
    The Cape Cod Canal is a well-known waterway on that part of the coast, and competent navigators may be assumed to be familiar with its general characteristics.

2. CANALS ⬿29—OWNERS OF CANAL—LIABILITY.
    The company owning the Cape Cod Canal does not guarantee the safety of vessels using the canal, and its obligations are not to misrepresent what it offers, and to use reasonable care for the safety of vessels which avail themselves of the canal.

3. CANALS ⬿29—CANAL COMPANY—PILOTS.
    Where company owning the Cape Cod Canal notified the shipping trade that it would not furnish pilots and tugs as it had in the past, such company is not responsible for any negligence on the part of a pilot and tug employed by a steamer to assist it in navigating the canal, even though it was required by the canal company to take a pilot.

4. CANALS ⬿29—ACCIDENTS—LIABILITY OF COMPANY.
    Where a steamer in charge of a licensed pilot grounded while proceeding through the Cape Cod Canal at a point past shoal waters, held, that the

---

⬿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

canal company was not liable on the theory of insufficient depth in the canal.

5. SALVAGE ☞22—NEGLIGENCE OF SALVOR.
Where the work of salving a vessel which stranded on one of the banks of the Cape Cod Canal would have been greatly delayed, had ground tackle been prepared to hold the vessel to the bank when she should become free, *held*, that the salvor, having safely released the vessel and turned it over to a canal pilot of recognized ability, who accepted the charge and undertook to proceed through the canal, was not liable.

6. CANALS ☞29—CANAL COMPANY—LIABILITY.
The second stranding of a steamer while attempting to proceed through Cape Cod Canal *held* not the result of any defect in the canal for which the canal company was liable.

7. CANALS ☞23—INJURIES TO—LIABILITY.
Where a vessel of the whaleback type, which was able to maneuver as well as ordinary steamers of that kind, was expressly invited to proceed through the Cape Code Canal, the canal company cannot recover against the owner for damages due to the blocking of the canal by the vessel, etc., which sunk after stranding against the sides.

8. MASTER AND SERVANT ☞315—INDEPENDENT CONTRACTOR—LIABILITY.
Where the owner of a steamer which had stranded on the side of a canal engaged an independent contractor to release the craft, and the steamer again stranded and sank shortly after being released, owner is not liable to canal company on ground it was negligent in allowing steamer to come afloat in an unsafe condition for navigating the canal.

9. CANALS ☞23—NEGLIGENCE—WHAT CONSTITUTES.
Where a vessel which had already stranded once on the side of the Cape Code Canal was suddenly freed, and a duly licensed pilot, who was on board, attempted to continue navigating through the canal, *held*, that the master could not be deemed at fault in not preventing the pilot from attempting to navigate the vessel through the canal, so as to render the owner liable, the vessel having subsequently sunk; it appearing the master acted in an emergency and was not familiar with the canal.

In Admiralty. Libel by the White Oak Transportation Company against the Boston, Cape Cod & New York Canal Company together with libels by the Canal Company against the Transportation Company, and a libel and intervening petition against the T. A. Scott Company, Incorporated. The several libels and intervening petition dismissed.

Case No. 1517:
Currier, Young & Pillsbury, of Boston, Mass., for libelant.
Samuel Park, of New York City, for respondent.

Case No. 1518:
Currier, Young & Pillsbury, of Boston, Mass., for libelant.
Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for respondent and garnishees.

Case No. 1555:
Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for libelant.
Currier, Young & Pillsbury, of Boston, Mass., for respondent.
Warner, Stackpole & Bradley, of Boston, Mass., for intervening petitioner Northern Coal Co.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

MORTON, District Judge. This litigation arises out of the two strandings of the steamer Bay Port in the Cape Cod Canal. The determination of the causes of those accidents and the responsibility for them will, in effect, dispose of most of the questions presented by the somewhat involved pleadings in the three cases.

The Bay Port was a whaleback steamer, 265 feet long, carrying about 2,400 tons of coal. On the evidence now before the court she appears to have been a staunch vessel, properly manned, supplied, and equipped. No failure of her mechanism entered into either accident. She steered as well as the ordinary whaleback steamer; but vessels of that type do not handle as sharply, nor as well, as those of the usual deep-sea model. She was deeply laden, but not so as to interfere with her ability to maneuver.

[1, 2] The canal is one of the well-known waterways on this.part of the coast. Competent navigators may be assumed to be familiar with its general characteristics. It is a narrow channel, of no great depth, in which at times heavy tidal currents exist. The Canal Company does not guarantee the safety of vessels using the canal; its obligations are, not to misrepresent what it offers, and to use reasonable care for the safety of vessels which accept its offer and avail themselves of the canal.

[3] On December 13, 1916, the Bay Port appeared at the Buzzard's Bay entrance to the canal and requested passage through. She was required by the Canal Company to take a pilot for the canal; and Capt. Rochester, who held a United States license for it, went down to her. The owner of the Bay Port—and I understand that the owners of the cargo adopt the same position—expressly disclaims any charges of negligence against the pilots and tugs in respect to either accident. So that it is perhaps unnecessary to determine the exact relation between pilots Rochester and W. Lewis and the Canal Company, and between the tugs that assisted the Bay Port and the Canal Company. I may say, however, that in view of the public and general announcement of the Canal Company early in September, 1916, by circulars to the shipping trade, that thereafter the pilots and tugs would not be in its employ, and of the arrangements then made, I do not think that, at the time of the accident, either the pilots or the tugs were so far agents or servants of the Canal Company as to make it responsible for their negligence. They had previously been so, and that relation had largely increased the liability of the company for accidents in the canal. Undoubtedly the new arrangement of September, 1916, was made for the purpose of avoiding a continuation of that liability. But, even so, it was a change which the Canal Company had a right to make, provided it did so in an open and public manner, and did not mislead vessels into a belief that the old arrangement still continued. Rochester is to be regarded as an independent pilot employed by the Bay Port on her own account to assist her through this somewhat difficult waterway.

The Canal Company signaled that the canal was open for vessels bound east, and by Rochester's orders the Bay Port got under way and proceeded into the canal. It was about half tide, and there was

a strong head current of three or four knots an hour running west in the canal. The steamer took the assistance of the tug Dalzelline, which went ahead on a short hawser.

The tug and steamer progressed satisfactorily through the first two bridges into the long stretch between the Bourne and Sagamore bridges. At a point about two miles east of the Bourne bridge, the Bay Port swerved (or sheered) slightly toward the north bank. This sheer does not seems to have been of much consequence. Captain Hammett testifies in reference to it:

"Q. Was the sheer to port of any consequence? A. Not very much—very slight. Q. Was it of any consequence at all? A. What say? Q. Was it of any consequence? A. Why, a little; you could call it of consequence or not, just as you like. Q. I want your idea. A. I say I don't know. It was very little; I couldn't say whether it was two feet or four feet; it was a little sheer. Q. Little sheer? A. Yes, sir."

After the swing was checked the steamer straightened out and went on a short distance nearer the north bank, and parallel with it. Her helmsman testifies:

"I know she was some little distance out—out of the center; * * * towards the port bank, and running along parallel with it. * * * She would not swing away from it; * * * clung to the bank."

An effort was made to bring her back to the center of the channel, and the helm was put to port for that purpose. She seems not to have minded it readily, and the amount of helm was increased. Then the Bay Port suddenly left the north bank, and started on a sharp sheer across the canal. The situation was immediately recognized as an emergency; her helm was reversed and put hard astarboard, her engines were backed, and the tug tried to pull her straight. The result of these efforts was that she straightened out, but not before she was so close to the south bank that her bow stranded on it, about her length, or a length and a half, from where the sheer started; and she lay there nearly parallel with the canal. The tide was falling, and the efforts immediately made to pull her off proved unsuccessful. This constitutes the first of the two accidents which figure in the case. The Canal Company suffered no appreciable damage from it.

[4] In order to discuss the steamer's charges of fault against the Canal Company for this accident, a more detailed description of the canal at this point is required. The Canal Company represented to the public that the canal had 25 feet of water at mean low tide. This representation was known to Capt. Hammett of the Bay Port. The canal had been dug to that depth, but the action of currents and other forces constantly tended to create shoals in it. One of these shoals the Bay Port had passed over shortly before taking her sheer to the north bank. It had about 19¼ feet of water at mean low tide, on the shallowest spot, and at the time in question—the tide being about half up—about 2½ feet more; i. e., from 21 to 22 feet. The draft of the Bay Port was about 18 feet 2 inches, so that there were 3 or 4 feet of water under her on the shoal. It terminated about 1,000 feet from where the Bay Port hit the south bank, and for the

intervening distance there was more than 25 feet of water at mean low tide.

A short distance west of where the Bay Port struck there was, on the north bank of the canal, a slight projection, the remains of the final dam which separated the two ends of the canal during construction. This projection, or "knuckle," as it has been called, .did not extend into the channel of the canal, nor far enough out from the bank to constitute in itself any menace to navigation. On a westerly tide it set up a surface current which slanted towards the south bank. It seems probable that, after the Bay Port had begun to turn away from the north bank, she was caught by this current, as well as by the general current in the canal, and that the cross-current was one of the forces which prevented her from being controlled in time to avoid stranding.

The evidence for the Bay Port is that, unless a vessel like her has from 3 to 5 feet of water under her bottom, she is likely to "smell the ground," as it is called, which interferes with her steering, and may cause her to sheer. The Transportation Company contends that this is what occurred when the Bay Port crossed the shoal above referred to, and was the reason why she swerved towards the north bank; that from that point she was in. effect out of control; and that the shoal was, therefore, the proximate cause of the stranding.

It does not seem to me, however, that the facts support this contention. The eastern edge of the shoal was, as above stated, almost 1,000 feet from where the Bay Port struck. She passed safely over it, and its effect on her steering did not extend beyond the time when the sheer to the north bank—assuming that the shoal caused that sheer, which is by no means certain—was checked. Thereafter she "clung to . the bank," as her helmsman puts it. Neither he, nor her pilot, nor her captain, all of whom have testified at length in these proceedings, appears to. have regarded her situation as dangerous while she was doing so. Her speed was not slowed, nor was the tug called upon for help. The causes of the stranding seem to have been the large amount of port helm, which, by the pilot's orders, had been given the steamer to bring her away from the bank, the suddenness with which she finally minded her helm, the unexpectedly large swing which she took, and the general current and cross-current in the canal, all of which, acting together, made it impossible to control her in time to prevent her from striking. The "knuckle" and the current occasioned by it were well known to the canal pilots and were customarily allowed for in navigating at that point. Vessels constantly passed it safely. It does not seem to me that the condition of the canal there was such as to warrant a finding of negligence against the Canal Company for permitting the Bay Port to use the canal. The Canal Company was not at fault for the first stranding; which appears to me to have been due, either to pure accident, or to faulty navigation by the pilot.

[5, 6] As· to the second stranding: The T. A. Scott Company was asked to come to the assistance of the stranded Bay Port and promptly did so, beginning work that evening. Its men stopped the small hole in her hull, made when she struck the bank, and had begun to remove

her cargo, when she suddenly and unexpectedly floated at about half tide, shortly after 10 o'clock on the following morning. Her captain and crew had remained on board and were on her at the time. W. Lewis, a canal pilot of recognized ability, was also on her. Just why he was there is not clear; apparently it was to complete the job, which Rochester had undertaken the previous day, of piloting the steamer through the canal. He and her captain at once hurried to her bridge, and her crew to their stations. There was a strong current flowing east, the direction in which the steamer was going. No arrangements had been made to hold her to the bank, and, as soon as she left it, she was seized by the current and swept along at a speed of three or four miles per hour. Three tugs were around her with steam up, and the Bay Port also had steam on her own boilers. She was, by reason of the water which she had taken in, down by the head. The day before she had drawn less at the bow than at her stern; she now drew, according to Capt. Hammett, about 18 inches more at the bow, and she had a list to port.

These changes in her trim certainly did not improve her steering qualities; probably they appreciably impaired them. Capt. Hammett testified:

"Q. And did she steer as well as she had the day before, or was she logier? A. She might have been a little logier; I couldn't say as to that. Q. A little logier? A. Might have been a little logier, but steered all right. Q. Did you have any difficulty in steering her during the first half mile or so? A. No, sir; none."

As the steamer did not take on steerageway until she had floated a considerable distance, it would appear, on her own testimony, that she began to steer badly almost as soon as she began to steer at all. On the testimony of Pilot Lewis, she ran from the very beginning "a very zigzag course." He says:

"We stopped her engines and let her drift as much as we could, because we couldn't do nothing with her; she was drifting from one side to the other."

Capt. Lecompte, who commanded the tug Dalzelline, that was ahead of the Bay Port on a hawser at this time, testifies:

"She commenced swinging. you know, backward and forward; she would take sheers, you know. We had a short hawser, and we held her straight two or three times before she did land."

It is charged as a fault against the Scott Company, in the libel and intervening petition against it, that it failed to make adequate preparations to hold the steamer safely, if she should come off. The evidence that it could not have done so by ground tackle, without greatly delaying salvage work, which would have been inadvisable, is so clear and convincing that discussion of the point seems unnecessary. As soon as she floated, Pilot Lewis, with her master's assent, assumed control of her, and the Scott Company had nothing to do with the orders he gave. Its salvage work was for the time being suspended; the steamer went forward on her own account, not under control of the Scott Company as part of the salvage operations.

The courses open when the Bay Port floated were, either to hold her in the channel where she came off, by tugs, or to drop her down to some dolphins and tie her there for the time being—both of which, it seems clear, could have been done—or to take her on through the canal. The question had been discussed by Capt. Hammett, Capt. Joseph Lewis (of the Scott Company), and Pilot Lewis. The Canal Company wanted to get her out of the canal as soon as possible, and its superintendent had so told Pilot Lewis.

It was generally understood among all parties interested that, when the Bay Port came off, she should, if possible, be taken through to Sandwich at the eastern end of the canal. Capt. Hammett testified on this point:

"Q. Was anything said as to tying up at Sandwich, do you remember? A. I don't know as there was. I think that that was generally understood; that that was where she was to go if she floated; that she was to tie up at Sandwich. Q. Well understood by whom? A. Why, generally understood. I think that was talked over; that if she floated, why, I would take her down and tie her up at Sandwich. Q. When was that talked? A. I think it was talked—might have been the night before, or that day, I can't say; I just remember some conversation in regard to that matter, in that line. Q. With whom? A. Why, with Capt. Lewis and the pilot, and I guess myself; I don't know but Mr. Gardner (of the Scott Company). The talk was all general; I couldn't specify exactly just when or who was there. * * * Q. Did that seem to you to be the proper thing to do? A. I think so; yes, sir. Q. In the event of her floating, she was to be tied up at Sandwich? A. I think so, yes, sir; that was the general impression."

The sudden and unexpected floating of the steamer and her being caught by the current in the narrow channel created a serious emergency. Capt. Joseph Lewis, who was at the time on the lighter Salvor, alongside the Bay Port, called to Pilot Lewis on the steamer's bridge, "She is yours," or words to that effect, to which Pilot Lewis assented. From that time until after the accident, the Scott Company, as before stated, had nothing more to do with the steamer, and exercised no control over her. Pilot Lewis assumed command of her. By his orders, one of the tugs (the Dalzelline) took a short hawser ahead; another pushed the steamer's stern straight with the canal, and then took away the lighter; the third tug, apparently without orders, swung out into the current, and started after the steamer, with the idea of getting a line on her stern. The order was given to start the steamer's engines full speed ahead, in order to obtain steerageway. Meanwhile the Bay Port was drifting along the canal, going in this manner perhaps a third of a mile. Then by the action of her own engines, and of the tug ahead, she obtained steerageway through the water and took on a speed over the ground of about six miles per hour.

Some dolphins where she might have been tied up were passed without any effort to place her there. Shortly afterward, the tug Hazelton came up behind the Bay Port and offered a line to her quarter. The men on the Bay Port were so much occupied that nobody took it. The Bay Port, continuing on, sheered toward and narrowly missed the dredge Trilby at work in the canal. This sheer was broken by the tug and the steamer's helm. A short distance further on, the Bay Port again sheered toward the south bank, and again the sheer was broken.

She then sheered toward the north bank, and, in spite of all efforts to check her, stranded heavily there. Her stern swung across the canal and struck the south bank; the bow came clear, moved a short distance downstream, and again grounded. She sank almost immediately from injuries to her hull, and became a total loss; the wreck being destroyed some weeks later.

About 2,000 feet west of where the Bay Port finally landed, she passed over a shallow spot, much like that above described in connection with the first stranding. There was everywhere on it, except close to the sides of the channel, 20 feet of water at mean low tide, and at the time of the accident, the tide being about half up, about 3 feet more; i. e., about 23 feet. It is contended by the owner of the Bay Port that the shoal caused her to sheer and was the proximate cause of the accident, and that the Canal Company is therefore liable. This shoal was farther from the place of the final accident than the first shoal was from the first accident. Throughout the intervening distance there was at least 25 feet of water at mean low tide. Two separate sheers were taken and broken after passing the shoal before the steamer finally struck. It seems to me that, even if the shoal be regarded as a negligent obstruction in the canal, it was not the cause of the accident.

From what has been said, it follows that the charges of negligence against the Canal Company by the Transportation Company have not been sustained, and that the libel against it must be dismissed. No charges are made here by any party against the pilots; their conduct need not be further scrutinized. The Scott Company was not negligent in failing to hold the vessel to the bank. When she floated, it immediately surrendered her to her master and pilot, who accepted her without objection; thereafter it exercised no control over her movements. No sufficient reason appears for holding it at fault in any respect. The libel and the intervening petition against it must be dismissed.

[7] As to the libel of the Canal Company against the Transportation Company: The first three charges of fault in this libel allege (in substance) negligence on the part of the owner of the Bay Port in taking her into the canal at all, on the ground that she did not steer well enough to attempt the passage of such a place with safety. It does not appear, however, that the ability of the Bay Port to maneuver was inferior to that of the ordinary steamer of her size and type. It was a fairly common type, the characteristics of which were known to the Canal Company. The Transportation Company had been solicited by the Canal Company to send its steamers, including the Bay Port, through the canal. It can hardly be held negligent for accepting the invitation of the libelant. These charges are not sustained.

[8, 9] It is further charged that the Transportation Company was negligent for suffering the steamer to become afloat in an unsafe condition for navigation in the canal. The salvage work was, however, in charge of an independent contractor, the T. A. Scott Company. The Transportation Company exercised no control over it. After

the Bay Port came off the bank, she could have been held in the stream by the tugs till slack water, or she could have been tied to the dolphins. Her floating off was not the proximate cause of the accident. The Canal Company's libel does not charge negligence in the management of the steamer while she was in the pilot's charge after she came off the bank, and no such contention has been made by it. It is further argued by the Canal Company—under what charge in the libel is not clear—that Capt. Hammett was at fault for not preventing Pilot Lewis from attempting to take the Bay Port through the canal after she floated. This question is not free from doubt. The day before, under much safer conditions both of current and of trim, the Bay Port had been unable to go through safely. It is evident that a great mistake was made in supposing that it was safe to renew the attempt under the conditions existing when she came off the bank. It is, however, to be remembered that the decision to go on was made under the pressure of an unexpected emergency (caused by the floating of the steamer so long before high water that the tide was still running at full strength), and that it followed out the plan of action which had received the assent of all parties in interest, including the Canal Company, although nobody foresaw the situation which actually presented itself. Capt. Hammett was unfamiliar with the canal. He had been through it only a few times, and never with a loaded vessel. He was not pilot for it, and had no intimate knowledge of the dangers which navigation there involved. He was without experience in handling vessels in the canal. The question presented was not one of ordinary navigation, but of navigation under very uncommon conditions and with reference to a peculiar waterway. Pilot Lewis was in many ways better qualified than Capt. Hammett to decide what to do.

The failure to tie up at the dolphins which were passed before the accident seems hard to justify on the evidence before the court. They were reached after the first crisis of the emergency had gone by, and there had been time to consider what should be done. With the help of the tugs and her own engines the Bay Port could easily have been placed at them. While there, she would, however, have substantially obstructed the canal; and I have no doubt that, in failing so to deal with her, Pilot Lewis had in mind Capt. Geer's instructions to get out of the canal, if possible. It does not appear that Capt. Hammett knew about the dolphins before reaching them; and he testifies that even now he could not say whether it would have been safe to tie the Bay Port to them, or not—a statement which I believe. Considering all the circumstances, I think Capt. Hammett was not negligent for not preventing Pilot Lewis from attempting to take the ship through to Sandwich.

The charge of fault against the Transportation Company for not sooner removing the wreck has not been argued, and on the evidence before the court it does not appear that the Transportation Company was negligent in that respect. The libel of the Canal Company against the Transportation Company must also be dismissed.

In view of the possibility of appeal, there ought, perhaps, to be

a decision upon the question presented by the request for limitation of liability contained in the answer of the Transportation Company. This matter was expressly reserved and has not been heard. Upon a request by either party, filed with the clerk within 10 days, the case will be set down for further hearing upon this issue. If no such request is made, the question will be decided on the evidence as it now stands.

Decrees accordingly.